IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID B. NEDLEY, ) <br> ) <br> Petitioner, ) <br> ) <br> vs. ) <br> ) <br> D. L. RUNNELS, Warden, ) <br> ) <br> Respondent. ) <br> ) | No C 03- 5237 JSW (PR) <br><br> ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS <br><br> (Docket No. 20) |

## INTRODUCTION

David B. Nedley , a state prisoner currently incarcerated at Salinas Valley State Prison, filed this *pro se* petition for a writ of habeas corpus under 28 U.S.C. § 2254, alleging ineffective assistance of counsel in violation of the Sixth Amendment. Per order filed on February 26, 2004, the court found that the petition, when liberally construed, stated a cognizable federal habeas action under § 2254 and ordered Respondent to show cause why a writ of habeas corpus should not be granted. Respondent filed an answer. Petitioner subsequently filed a traverse followed by a supplemental traverse. Petitioner filed motions before this court for an evidentiary hearing and the appointment of counsel, both of which were denied. On February 26, 2007, Petitioner filed a motion seeking discovery and to expand the record (docket no. 21), which is DENIED for the reasons set forth below. This *pro se* habeas petition is now before the court for consideration of the merits. For the reasons discussed, the petition is denied.

## PROCEDURAL BACKGROUND

On April 18, 2002, Petitioner was convicted in the Alameda County Superior Court. The jury found Petitioner guilty of rape while acting in concert (§§ 206(a)(2)/264.1), three counts of committing a lewd act upon a child (§ 288(a)), and three counts of kidnapping (§ 207). He was later sentenced by the trial court to 62 years-to-life incarceration. After filing a notice of appeal on May 16, 2002, Petitioner personally requested that his appeal before the First Appellate District be dismissed. Petitioner later filed for collateral relief before the state superior, appellate and supreme courts. Petitioner timely filed the instant federal petition for a writ of habeas corpus. This court has subject matter jurisdiction over this habeas action under 28 U.S.C. § 2254 and, because Petitioner was convicted in Alameda County, this action is in the proper venue.

## FACTUAL BACKGROUND

The facts underlying the charged offenses, as stated in Petitioner's probation report, are summarized below. Both Petitioner (in his supplemental traverse) and Respondent (in the answer) incorporated the following statement of facts excerpt verbatim:

> On August 27, 2001, fourteen year-old Marquita Doe and her fourteen year-old stepsister Vartisha Doe were in the area of Birch Street and 82nd Avenue in East Oakland on the way to the store. En route, they encountered defendant, who was casually known to Vartisha as 'Keith.' Vartisha had a conversation with defendant and he agreed to give the girls a ride to the store in his van. When Marquita and Vartisha entered the van, defendant introduced himself as 'Keith" to Marquita.
>
> Instead of going to the intended store, Nedley drove the girls to an auto repair shop, where he had a tire repaired. During this period, Marquita inquired as to whether or not they were still going to a store. Nedley assured her that they were. When the van left the auto repair shop, Nedley drove to a friend's apartment located near Eastmont Mall. The defendant, Marquita and Vartisha went into the friend's apartment and remained there for a while. During that time, Nedley made Marquita uncomfortable when he rubbed her arm while she and Nedley were talking in the friend's bedroom.

Nedley, his friend, Marquita and Vartisha left the friend's apartment and got into the van. Again, Marquita was concerned about still wanting to go to a store.

Rather than going to a store, Nedley drove the group to Dimond Park. At the park, he poured some gin that his friend brought along. All parties had some of the alcoholic beverage. After consuming the gin, Nedley's friend and Vartisha got out of the van and Marquita and Nedley remained inside. Before Marquita had a chance to get out, Nedley drove off, separating her from her stepsister. Nedley drove Marquita to a remote area in the Oakland hills. During the drive, Marquita asked repeatedly to be taken back to her sister, asked where they were going and insisted that she could not be separated from her stepsister. Nedley declared that he wanted to be alone with her. Marquita did not want to be in the van alone with Nedley, as she was not familiar with him or the area.

After passing by trees and as the night descended, Nedley parked the van, demanding that Marquita take off her pants. She refused. Nedley folded out the back seat of his van, which converted into a bed and told her that he would assist her in removing her pants. Again, Marquita refused, while Nedley told her to get out of the van and it would be a long walk home. Feeling as if she had no other options, Marquita got out of the van and began to walk along the two-lane road. She was alone, it was getting dark and she was scared. A car containing a family drove up to Marquita and asked if she needed help. She said yes, and they drove her to a location where 911 was called. The Oakland Police Department arrived, took a statement from Marquita and took her home. Her stepmother consoled Marquita.

After abandoning Marquita, Nedley returned to his friend and Vartisha. Vartisha asked where Marquita was and Nedley told her he took her home. Even though she did not believe him, Vartisha agreed to get a ride to a nearby stop, where she took a bus home. She did not want Nedley to know where she lived. When she arrived home, Marquita was there.

On Saturday October 6, 2001, thirteen year-old Nicole Doe and thirteen year-old Crystal Doe were at the Hilltop Mall in Richmond. They met defendant, age twenty, who was selling bootleg CD's inside of the mall. During the brief conversation, the girls advised Nedley of their age and where they attended middle school in Pinole. Nicole gave Nedley her home phone number, while he gave her the number to his cellular phone and pager number. Nedley told the girls that his name was 'Keith.' Nedley asked Nicole if they could 'kick it' later that night. Nicole called Nedley that night and they had a brief conversation.

The following Monday, Nedley phoned Nicole as she was getting ready to go to school. He again asked if they could 'kick it,' or

3

hang out and she told him that they could not. Nedley called Nicole again on Tuesday and asked if she could hang out with him. He also stated that his 'cousin' wanted to hang out with Crystal. Nicole agreed, called Crystal and arranged for Crystal to meet them in front of their school. Crystal was not fully informed as to what was going to take place that morning between herself, Nicole and the defendants. Nedley came to Nicole's home in El Sobrante and picked her up. Co-defendant Yahya Shabazz, twenty-three years old, drove the van. They stopped at a gas station and Nicole, Shabazz and Nedley took hits from a marijuana cigarette. They proceeded to the middle school in Pinole where they saw Crystal at a bus stop. Crystal informed Nicole that she wanted to go to a nearby store and Nedley agreed to take her. Crystal was initially apprehensive and hesitant to get into the van, but decided to go along.

Shabazz got onto the freeway and drove to Oakland. They stopped at a gas station in East Oakland and then went to a park in the Oakland Hills. At various points from the time the van left Pinole until it reached Oakland, both girls asked to be taken back to school. They repeatedly asked where they were going and expressed a desire not to be in the van. Crystal started to cry and she became very nervous. While they drove to Oakland, Nedley told Crystal, 'Let me see what you got,' and put his hand in Crystal's shirt, touching her chest. Crystal attempted to move away from him in the rear of the van.

Once they got the park, Shabazz and Nicole got out of the car and Nedley and Crystal drove to another area nearby. Crystal was unaware that Nedley was going to take her to another area, however, before she could say anything Nedley was driving away from Nicole and Shabazz. Nedley stopped the van in a secluded location and told Crystal to go to the rear of the van. Nedley placed a wrapped condom on his leg. Nedley started to pull up Crystal's shirt and tried to pull down her pants. Nedley told her to shut up. Crystal continued to cry and resist Nedley until he stopped. Nedley took Crystal to a nearby gas station and pushed her out of the van. As she got out, he told her that 'he would just get some from her friend.' A bystander consoled Crystal at the gas station and asked what had happened. Crystal relayed what had transpired and 911 was called.

After Nedley dropped off Crystal, he went back to the area where Nicole and Shabazz were located. They were talking on a bench and no physical contact had taken place. Nicole and Shabazz entered the van and Nicole saw that Crystal was not inside, yet her backpack was still there. She inquired as to Crystal's whereabouts and Nedley stated that Crystal saw her father and went home.

Nicole got into the van, although she did not believe that Crystal had in fact left with her father as Nedley claimed. Once inside the van, Nedley and Nicole were in the rear area, where there was a

4

bench seat. Shabazz drove the van. Nedley asked Nicole if she could 'hit it.' Nicole told Nedley that he couldn't (have sex). He began to pull down her pants and underwear, as she resisted him. Nedley pulled down his pants and exposed his penis. He touched her vaginal area with his hand. He put a condom and Nicole told him 'No.' Nedley pushed her legs back to her chest and penetrated her vagina with his penis. Nicole tried to get up but could not under the full weight of his body. Nedley forcibly raped Nicole for 5 - 10 minutes as Shabazz drove the van and looked back at Nicole and Nedley via the rearview mirror. There was no barrier between the front seats and the bench seat in the rear of the van.

Nedley ejaculated and threw the condom out of the window. As the van stopped, he then told Shabazz to 'get some.' Shabazz came to the rear of the van and asked Nicole to perform oral sex on him, as Nedley began to drive the van back toward the gas station where Crystal was taken earlier. Nicole refused and said that she would not have sex with him. Shabazz then touched Nicole's vaginal area without her consent, as the van neared the gas station. Nicole got out of the van and started crying. She saw Crystal and the bystander and arrived shortly before law enforcement arrived.

That day, the girls had contact with the Oakland Police Department, the Pinole Police Department and personnel at Children's Hospital in Oakland. A sexual assault examination performed on Nicole showed injuries consistent with sexual intercourse and trauma to the vaginal area. Based on information proved by the girls, Nedley and Shabazz were identified by both girls in separate photo-lineups. Nedley was arrested on October 17, 2001 and Shabazz was arrested on November 8, 2001.

## **STANDARD OF REVIEW**

This Court may entertain a petition for habeas relief "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The writ may not be granted unless the state court's adjudication of any claim on the merits: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* at §

5

2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if a state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-12 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if a state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

Based on this deferential standard, federal habeas relief will not be granted "simply because [this] court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. While circuit law may provide persuasive authority in determining whether the state court made an unreasonable application of Supreme Court precedent, the only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. *Id.* at 412; *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003).

In deciding whether a state court's decision is contrary to, or an unreasonable application of, clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of the petitioner's claim in a reasoned decision. *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000). When the state court decisions do not provide a reasoned opinion, as in this case, the court must "perform an 'independent review of the record' to ascertain whether the state court decision was objectively unreasonable." *Himes*

*v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003) (quoting *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000)).

## **DISCUSSION**

In his petition for writ of habeas corpus, Petitioner alleges ineffective assistance of counsel based on the failure of his defense attorney to: (1) call Ann Santiago and Oakland Police Officer Charles Stone as defense witnesses, and (2) play taped statements of prosecution witnesses before the jury.

**A.     Legal Standard**

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). *See Williams (Terry) v. Taylor*, 529 U.S. 362, 404-08 (2000). The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Strickland*, 466 U.S. at 686.

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, Petitioner must establish two things. First, Petitioner must establish that counsel's performance was deficient and fell below an "objective standard of reasonableness" under prevailing professional norms. *Strickland,* 466 U.S. at 687-88. Second, Petitioner must establish that he was prejudiced by counsel's deficient performance and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* The *Strickland* framework for analyzing ineffective assistance of counsel claims is considered "clearly

established Federal law, as determined by the Supreme Court of the United States" for the purposes of 28 U.S.C. § 2254(d) analysis.

**B.      Analysis**

    **1. Failure to Present Witness Testimony**

Petitioner claims that his defense counsel was ineffective for failing to call two witnesses to testify at trial: (1) Ann Santiago, the gas station cashier who first encountered the victims, and (2) Oakland Police Officer Charles Stone, the patrol officer who first arrived at the gas station and interviewed the victims. Petitioner contends that these two witnesses would have provided additional evidence to demonstrate that the victims lied in their statements about being forcibly abducted before the rape and damaged the credibility of the victims.

    **(a) Deficient Performance**

Defense counsel's decision not to call these potential defense witnesses is not unreasonable and does not fall below an objective standard of reasonableness under prevailing professional norms. Petitioner fails to demonstrate how his attorney was incompetent or ineffective and does not satisfy his burden of showing through evidentiary proof that counsel's performance was deficient. *See Toomey v. Bunnell*, 898 F.2d 741, 743 (9th Cir.), *cert. denied*, 498 U.S. 960 (1990). Petitioner does not provide specifics as to what new or exculpatory evidence these witnesses would have offered, aside from the conclusory claim that both Officer Stone and Ann Santiago "made affidavitt [sic] statements that are both material, favorable, and necessary." Petition at 2. Petitioner first alleged ineffective assistance during his trial motion for a continuance. Reporter's Transcript ("RT") at 2461.

The failure to call a witness cannot establish ineffective assistance when defense counsel is well-informed of the facts and circumstances of the witness's

8

account. *Eggleston v. U.S.*, 798 F.2d 374, 376 (9th Cir. 1986). Defense counsel "had complete access to all of the witness interviews and statements taken by the government" and was clearly aware of the testimony that Officer Stone and Ann Santiago might offer at trial. *Id.* During preliminary trial preparation before testimony commenced, defense counsel informed the court that Petitioner wished to subpoena Officer Stone and Santiago, but counsel believed that both witnesses had already been subpoenaed by the district attorney and would potentially serve as prosecution witnesses. RT at 63; *see also,* Clerk's Transcript ("CT") at 545 (prosecution's proposed witness list, which included Ann Santiago and Officer Charles Stone).

This is not a case where defense counsel failed to conduct a reasonable investigation necessary to make an informed decision or to make a reasonable decision not to investigate further. *See Strickland*, 466 U.S. at 691; *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994). Defense counsel had in fact followed up on Petitioner's suggestion and had investigated Ann Santiago as a possible witness. Following closing arguments at trial, Petitioner moved for a continuance based on his attorney's incompetence in failing to call Ann Santiago. In explaining his decision not to call Ann Santiago, defense counsel stated that he "called Ms. Santiago up and had a personal phone call with Ms. Santiago. I did not record that phone call, but at the conclusion of that phone call and having spoken personally and reviewed both the original statement and the statement given to my investigator, I came to the conclusion that to call Ann Santiago would be more hurtful than helpful to his case." RT at 2463-64.

In determining whether or not ineffective assistance of counsel occurred, tactical decisions of trial counsel deserve deference when counsel makes an informed decision based on strategic trial considerations and the decision appears

reasonable under the circumstances. *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994). A trial attorney's strategic decisions are not ineffective assistance simply because in retrospect better tactics are known to have been available. *See Strickland*, 466 U.S. at 689; *see also United States v. Mayo*, 646 F.2d 369, 375 (9th Cir.), *cert. denied*, 454 U.S. 1127 (1981) ("[Petitioner's] allegations amount to nothing more than a difference of opinion with respect to trial tactics. That alone generally does not constitute a denial of effective assistance of counsel"). The ultimate decision not to call witnesses at trial is well within counsel's "full authority to manage the conduct of the trial." *Taylor v. Illinois*, 484 U.S. 400, 418 (1988) ("Putting to one side the exceptional cases in which counsel is ineffective, the client must accept the consequences of the lawyer's decision...to decide not to put certain witnesses on the stand").

      Defense counsel's decision not to call Ann Santiago was based on reasonable strategic decisions. During Petitioner's motion for a continuance, trial counsel expressly stated that "it is my opinion now as it was my opinion then that to call Ms. Santiago would not help Mr. Nedley in this case. If I thought that it would, I would have called her." RT at 2464. Based solely on the investigator's interview report, Petitioner claims that Ann Santiago's "observation of both [victims'] appeanse [sic] and behavior would dispute the way a normal rape victim would conduct themselve [sic]." Traverse at 2. Santiago did not actually witness the crimes and she could only attest that, in her personal observation of the victims arriving at the gas station following their assaults, she had trouble believing their story. CT at 768. Aside from her personal disbelief in the victims' story, Petitioner has not established that Santiago would have presented any new evidence that might have been helpful to his defense.

10

Similarly, the record indicates that trial counsel's decision not to call Officer Stone was a reasonable strategic choice. Officer Stone and Officer Eric Milina were the first police officers to interview the victims. Petitioner claims that Officer Stone observed the victims fabricate their story on two separate occasions, once where Officer Milina was not present. Officer Milina testified as a witness for the prosecution and was cross-examined by defense counsel over the course of two days. RT at 1037. In his testimony, Officer Milina stated that he "didn't really believe...the stories about being kidnapped [sic], but I thought that something did happen and [Office Stone] told me that he felt the same way." RT at 1086.

In fact, the record actually suggests that Officer Stone was more sympathetic towards the victims than Officer Milina and, therefore, his testimony may have been detrimental to the defense. According to the testimony of Carol Haskell, the gas station customer who called 911 on behalf of Crystal Doe, Officer Stone was the only police officer who seemed "responsive" and "concerned" while the other two officers "didn't respond in a way that made me feel like the girls were going to be in good hands with them." RT at 1358-59; 1370.

Defense counsel did not err in failing to call additional witnesses where the court "find[s] their statements to be cumulative of the testimony given at trial." *U.S. v. Schaflander*, 743 F.2d 714, 719 (9th Cir. 1984) and Petitioner has not established otherwise. It is undisputed that the victims lied in their initial statements about being involuntarily abducted into Petitioner's van and other witnesses testified at length during the trial about this fact. Both victims confessed that they initially lied to the police due to fear of their parents' reactions and concern that the police would not help them if they had voluntarily

11

accepted a ride from Petitioner. RT at 130; 276. Petitioner has made no showing that Officer Stone's testimony would have done anything other than merely reiterate the testimony of Officer Milina. *See Toomey*, 898 F.2d at 743. Petitioner has not established that counsel decision not to call witnesses Stone and Santiago constitutes deficient performance.

### (b) Prejudicial Effect

Even if defense counsel's failure to call potential defense witnesses was found to be deficient, the second prong of the *Strickland* standard would not be satisfied because Petitioner does not establish that he was prejudiced by counsel's performance. *Strickland*, 466 U.S. at 691-92 ("An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment"). To establish prejudice caused by the failure to call a witness, a petitioner must show that the witness was likely to have been available to testify, that the witness would have given the proffered testimony, and that the witnesses' testimony created a reasonable probability that the jury would have reached a verdict more favorable to the petitioner. *Alcala v. Woodford*, 334 F.3d 862, 872-73 (9th Cir. 2003).

In proving prejudice, Petitioner has the burden "to come forward with any evidence suggesting that the presentation of different...testimony...might have resulted in a different outcome." *Rios v. Rocha*, 299 F.3d 796, 813 n.23 (9th Cir. 2002). Petitioner provides no specific examples of exculpatory evidence from these witnesses and does not satisfy his burden of demonstrating prejudice from counsel's performance.

It is not clear how either witness would have benefitted the defense and there is reason to believe that, under cross-examination, the witnesses' testimony

12

would actually have damaged the defense. Officer Stone would have testified that, while he doubted certain details of the victims' kidnapping story, he still believed something had actually happened to the victims. RT at 1086. Similarly, from the investigator's report, it is clear that while Ann Santiago may have testified that she found the victims to be unbelievable, she also would have described how the victims were upset and crying. CT at 768.

Even if Ann Santiago's lay opinion about the victims' believability was considered admissible evidence, the expert testimony regarding rape victim trauma would have contradicted Santiago's impressions. Officer Van Sloten, an investigating officer in Petitioner's case as well as a certified rape crisis counselor, testified at length about her work with rape victims. RT at 1142. Based on her professional experience, Van Sloten described that victims of sexual assault may display a wide range of emotional reactions and there is no one normal reaction. RT at 1145. With juvenile victims, Van Sloten explained they "get giggly often when talking about sexual acts" and they "don't necessarily know the laws as well, so they think they'll get into trouble." RT at 1147. Marsha Blackstock, the executive director of Bay Area Women Against Rape (BAWAR), was also called by the prosecution to explain rape victim trauma. RT at 1889. While Ann Santiago found the victims unbelievable because they refused to go to the hospital, CT at 769, Blackstock stated that a sexual assault exam "is an incredibly strange kind of exam that is degrading in many ways" and often embarrassing and uncomfortable for rape victims, particularly young victims. RT at 1934-35.

Petitioner has not established that he suffered prejudice from counsel's failure to present the testimony of Officer Stone and Ann Santiago since there was already ample evidence before the jury that the victims had originally

fabricated their story of abduction and the prosecution conceded as much at trial. The jury was fully aware of the victims' conduct upon arriving at the gas station and still found Petitioner guilty. Calling Officer Stone and Ann Santiago as witnesses would only have corroborated these already well-established facts and would not have made a difference in the jury's results.

The evidence of Petitioner's guilt was extremely strong and the prosecution's case against him was highly persuasive. *See Luna v. Cambra*, 306 F.3d 954, 966-67 (9th Cir. 2002) ("we must consider the relative strength of the prosecution's case in analyzing whether counsel's errors prejudiced [Petitioner]"). After accepting a plea bargain, Petitioner's co-defendant Yayha Shabazz testified for the prosecution and completely confirmed the victims' story. RT at 1376. Shabazz picked up both victims with Petitioner and also drove the van while Petitioner raped Nicole Doe in the back seat. Through his perspective from the rear view mirror, Shabazz witnessed the victim tell Petitioner she did not want to have sex and observed that "[s]he was just frozen when he was pulling her pants down." RT at 1453.

Petitioner's own credibility was also severely undermined during cross-examination. Petitioner admitted to lying to the police, RT at 2174, and testified that his indictment was the result of a conspiracy involving the district attorney, the police, and the victims. RT at 2244-47. He accused one victim of being "brainwashed," RT at 2251, and argued another victim fabricated her entire story because he "would not give her a ride back home." RT at 2143. He could not recollect the last names or contact information for Stacy, his father's ex-girlfriend, and Robert, his mechanic–two people who Petitioner maintained would testify that his van was broken and being repaired the day he abducted Marquita Doe. RT at 2188-95. Petitioner denied any sexual contact with the

victims, yet the medical examination of Nicole Doe suggested recent vaginal trauma and sexual intercourse. RT at 1301. In his probation report, Petitioner even admitted to having sex with the victim, but claimed it was consensual. Ex. C at 5. After confessing to their initial fabrication that they had been abducted, the testimony of Crystal and Nicole Doe was consistent and corroborated by witness accounts from police and observers. Petitioner's testimony, however, was fraught with contradictions, evasive responses, and incredible accusations throughout.

Due to the strength of the prosecution's case, Petitioner is not able to show that there is a reasonable probability that, but for counsel's alleged unprofessional errors, the result of the proceedings would have been different. *Strickland* 466 U.S. at 694. Petitioner's conclusory allegations "fail[] to allege the specific mitigating evidence the witnesses would have presented" and this Court concludes "that even if counsel had called the additional witnesses, their testimony would have been either negative or cumulative." *Davis v. Woodford*, 384 F.3d 628, 649 (9th Cir. 2004).

**2.     Failure to Play Taped Witnesses Statements at Trial**

In his second claim, Petitioner alleges that his defense counsel refused to investigate or introduce exculpatory evidence from taped statements made by prosecution witnesses. At trial, Petitioner requested that he be afforded a tape cassette player so he could personally listen to taped statements. CT at 548. The court granted permission and Petitioner was provided access to the prosecution's tapes by order of the trial court. CT at 548 (ordering the Alameda County Sheriff to provide Petitioner access to a cassette player). Petitioner contends that the taped statements should have been played in court "so that the jury could here [sic] one of the witnesses in the back-ground coaching the other witness

15

(victim) as to what to say." Supplemental Traverse at 9.  However, Petitioner does not specify which witness was being coached or what exculpatory statements the witness made.

### (a) Deficient Performance

Petitioner fails to demonstrate that his attorney was deficient in not playing the witness statements during trial.  At Petitioner's request, defense counsel informed the court that "Mr. Nedley has considered that I orally request that the prosecution be required to play all of the tapes."  RT at 63.  Defense counsel was clearly aware of these witness recordings and that Petitioner believed they were significant.

Counsel's decision not to play these recordings was clearly based on a reasonable investigation and reflects a strategic trial tactic.  *See Strickland*, 466 U.S. at 690.  While Petitioner himself never specifies what the tapes contained, defense counsel stated during a motion for continuance that Petitioner wanted to "play in its entirety the physical tape of statements taken by Officer Van Sloten." RT at 2464.  In providing his rationale for not playing these tapes, counsel explained that "[i]n my opinion, the cross-examination of Officer Van Sloten was more appropriate and helpful than the playing of the entire tape."  RT at 2465.

Petitioner's habeas petition simply makes the conclusory contention that the tapes "held material, favorable, exculpatory evidence in my defense."  Such unsupported, general claims are insufficient to establish ineffective assistance. *See United States v. Cronic*, 466 U.S. 648, 666 (1984) ("Respondent can therefore make out a claim of ineffective assistance only by pointing to specific errors made by trial counsel").  Without specific details from Petitioner about what exonerating statements were made and by whom, this Court cannot say that Petitioner's attorney was ineffective or incompetent for failing to play all the

taped statements before the jury.

### (b) Prejudicial Effect

Petitioner has also failed to establish that defense counsel's decision not to play the taped statements was sufficiently prejudicial to undermine confidence in the outcome of the proceedings. Petitioner fails to provide any evidence to establish prejudice or prove that playing these recordings would have resulted in a different outcome. *See Rios v. Rocha*, 299 F.3d 796, 813 n.23 (9th Cir. 2002). Petitioner does not establish what specific evidence would have been available through the taped statements and, therefore, does not prove that, but for this omission, there would have been a different trial outcome. *See Strickland*, 466 U.S. at 694. Even if Petitioner could establish that one of the witnesses was coached, it is unlikely the error would be sufficient to establish "a reasonable probability that, absent the errors, the factfinder would have had reasonable doubt respecting guilt." *Luna v. Cambra*, 306 F.3d 954, 961 (9th Cir. 2002) (quoting *Strickland*, 466 U.S. at 695).

### C.      Motion for Discovery and Expansion of the Record

On February 26, 2007, Petitioner submitted a motion for discovery and expansion of the record pursuant to Rule 6(a) of the Federal Rules Governing Section 2254 Cases, 28 U.S.C. foll. § 2254 (docket no. 20). Petitioner attached two interrogatories to the motion and requests that his defense counsel be compelled to answer his questions. In the interrogatories, Petitioner asks his counsel to identify why witnesses Stone and Santiago were not called to testify and why jurors were not presented with tapes of prosecution witnesses. According to Petitioner, these witnesses could have "stigmatized adverse witnesses' credibility" and the tapes would have offered "impeaching material" in the form of "contradictions and coercion." Motion at 2.

A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course. *See Bracy v. Gramley*, 520 U.S. 899, 904 (1997). However, Rule 6(a) provides that a "party shall be entitled to invoke the processes of discovery available under the Federal Rules of Civil Procedure if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise." Before deciding whether a petitioner is entitled to discovery under Rule 6(a), the court must first identify the essential elements of Petitioner's underlying claim and then determine whether the petitioner has shown "good cause" for appropriate discovery to prove his claim. *See id.* at 904. Good cause under Rule 6(a) is shown when it is "essential" for the Petitioner to "develop fully" the underlying claim. *Pham v. Terhune*, 400 F.3d 740, 743 (9th Cir. 2005); *see Jones v. Wood*, 114 F.3d 1002, 1009-10 (9th Cir. 1997) (finding good cause where petitioner identified specific material he needed to argue effectively that trial lawyer had rendered ineffective assistance, particularly where there was never any hearing on ineffective assistance claim at state court level).

Petitioner has not shown "good cause" sufficient to grant his discovery request and provides no "specific allegations" to demonstrate that he would be entitled to relief "if the facts are fully developed." *Bracy*, 520 U.S. 899 at 908-09 (quoting *Harris v. Nelson,* 394 U.S. 286, 299 (1969)). Petitioner's interrogatories merely seek to ascertain counsel's reasoning for failing to call potential witnesses and not playing taped witness statements at trial. Compelling defense counsel to provide his strategic reasoning for his trial decisions would offer no additional evidence to develop Petitioner's underlying claims. The trial record already contains express statements from counsel explaining his reasons for not calling witness Ann Santiago or playing the prosecution tapes. RT at

18

2463-65. Requiring defense counsel to reiterate and elaborate on the reasoning he offered at trial would provide no additional facts to help Petitioner fully develop his claim.

Judicial review of counsel performance is "highly deferential" and "the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689.  Petitioner did not overcome this presumption and, in reviewing the contested trial actions, the court has already found that counsel's strategic trial decisions did not fall below an objective standard of reasonableness. Further, defense counsel's decision-making rationale has no bearing on the Court's independent finding that Petitioner fails to satisfy the *Strickland* requirements of deficient performance and prejudice. Because Petitioner's "purely speculative" claims do not show "good cause," the motion for discovery and expansion of the record is DENIED. *See McDaniel v. United States District Court (Jones),* 127 F.3d 886, 888 (9th Cir. 1997) (docket no. 20).

## CONCLUSION

The state court's denial of Petitioner's habeas petition is not contrary to or an unreasonable application of established federal law determined by the Supreme Court. Therefore, Petitioner's claims of ineffective assistance of trial counsel are DENIED. The Clerk shall enter judgment and close the file.

IT IS SO ORDERED.

DATED: March 20, 2007

_____
JEFFREY S. WHITE
United States District Judge